# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Jackson March 2, 2010

## STATE OF TENNESSEE v. MICKEY EARL BROWN

**Appeal from the Criminal Court for Davidson County**
**No. 2008-A-538     Cheryl Blackburn, Judge**

**No. M2009-00786-CCA-R3-CD - Filed June 21, 2010**

The Defendant, Mickey Earl Brown, appeals his conviction upon a guilty plea in the Davidson County Criminal Court for aggravated assault, a Class C felony. The trial court sentenced the Defendant as a Range III, persistent offender to eleven years in the Department of Correction, to be served consecutively to a prior six-year sentence. On appeal, the Defendant contends that his sentence is excessive and that the trial court erred in imposing consecutive sentencing and in denying alternative sentencing. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Charles E. Walker, Nashville, Tennessee, for the appellant, Mickey Earl Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jeff Preston Burks, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises from the Defendant's stabbing two victims, Adrianne Tellmer and Sheryl Ann Walker, with a box cutter on November 1, 2007. He was indicted for two counts of aggravated assault, with one count later being dismissed.

At the sentencing hearing, Sheryl Ann Walker, testified that on November 1, 2007,

she, the Defendant, and others were at Adrianne Tellmer's house in Nashville "partying" and acknowledged that they had used drugs the previous day. Walker said that she and Tellmer were upstairs in Tellmer's bedroom when the Defendant came in the room with "something behind his back."   Walker described what happened next:

> And I was sitting on the bed.  And when I looked up he c[a]me across my face with whatever it was and blood shot everywhere. And I began to lose conscious[ness].  He started hitting the other girl Adrianne and she swung off of him some kind of way.  And he came back over towards me and went to stick me in my neck. I turned my hand up this way.  It cut my finger half off.  And she crawled to the door and started running I assume because I was in and out.  And when I got to the top of the stairs I tumbled down the 15 flights of stairs.  She made it to the back door where he proceeded to stab her in the neck numerous amounts of times.  And she was screaming, "You're going to kill me." So when he looked to see me going out the front door he ran towards me and started sticking me in my chest.  And I was pushing back, holding up against the wall.  Finally I made it out the front door and ran, tumbled down the hill to the neighbor's house.  And that's when I called 911 and . . . they kept saying I was dead because I was losing so much blood.  When the police finally came and got me out of the house he had already stabbed her in her chest and I think about nine times in her neck.  He cut me here three times in the chest.

Walker said that she received stitches to her face, lip, and nose and that she underwent surgery for her finger which was "unfixable" because the tendon and nerve had been "damaged from the cut." She said that she suffered seizures as a result of the trauma to her head and was prescribed antidepressant medication.  She said she still experienced nightmares and was receiving psychiatric treatment.  Walker said that she wanted the court to impose the maximum sentence and did not want the Defendant to receive probation because "[h]e's going to get back out and do the same thing."

The Defendant testified that "everything was fogged up" for about three or four weeks before the incident because he had not been taking his medication.  He said that he felt he had been drugged that day because he had hallucinations and "felt like [the victims] were both out to get [him]."  He said that he "couldn't concentrate . . . couldn't think.  I just felt like [the victims] were going to do something to me.  Like they were going to hurt me."  The Defendant said that since his incarceration, he had been prescribed Prozac and Zyprexa and

had completed rehabilitation programs, including anger management, Project Return, and Lifeline.

On cross-examination, the Defendant acknowledged that he was on probation when he committed the offense in this case. He admitted that he, along with others at Tellmer's house, had used cocaine the day of the incident, although he later denied using cocaine. Asked to explain why the incident with the victims had happened, the Defendant said, "I wasn't on my medicine. We were all having problems with money. [Walker] kept saying that I owed her money. . . . And then she kept going up on the price of the money." The Defendant acknowledged that he had been convicted of forgery in 1992 in Mississippi, for which he received a five-year sentence.

Bobby Aylward, the addictions treatment manager for the Lifeline Therapeutic Community at Corrections Corporation of America, testified that the Defendant had been "very calm" and cooperative while in the program. He described an altercation that occurred in December 2008 in which the Defendant did not fight back. Asked to compare the Defendant with other offenders who had been in the program, Aylward said that he would place the Defendant in "the top five percent."

Barry Suk, a volunteer at Corrections Corporation of America, testified that he had known the Defendant for about five or six months and had agreed to be his sponsor. He said that he had no reservations about the Defendant being released into the community.

Aolar Hart testified that she had known the Defendant since 1997 and that he had lived with her until his incarceration. She said that the Defendant had been treated for schizophrenia and that he did not take his medication when he was not with her. When the Defendant did not take his medication, he was "paranoid" and thought "somebody was trying to do something to him."

At the conclusion of the hearing, the trial court sentenced the Defendant as a Range III, persistent offender to eleven years in the Department of Correction. Finding that the Defendant had committed the offense while on probation for a previous offense, the court ordered that the Defendant's sentence be served consecutively to the prior sentence.

## ANALYSIS

On appeal, the Defendant contends that the trial court "should have sentenced him to ten years as a persistent offender concurrent with [his prior sentence] and granted him alternative sentencing." The State argues that the trial court properly sentenced the Defendant. Initially, we note that the Defendant is not presumed a favorable candidate for

-3-

probation. Although convicted of a Class C felony, the Defendant was sentenced as a Range III, persistent offender and was not entitled to be considered a favorable candidate for alternative sentencing. See T.C.A. § 40-35-102(6).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). This presumption of correctness is conditioned upon the affirmative showing that the trial court considered the relevant facts, circumstances, and sentencing principles. State v. Carter, 254 S.W.3d 335, 344-45 (2008); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to section 40-35-401(d) note, the burden is on the appealing party to show that the sentence is improper.

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." Ashby, 823 S.W.2d at 169. In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information as to sentencing practices for similar offenses in Tennessee, (7) any statement that the Defendant made on his or her own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

In imposing a specific sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." Carter, 254 S.W.3d at 345.

When determining if confinement is appropriate, the trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. T.C.A.§ 40-35-103(1)(A)-(C). The trial court may also consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. T.C.A. §§ 40-35-103(5), -210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). The sentence imposed should be the least severe measure necessary to achieve the purpose for which the sentence is imposed. T.C.A. § 40-35-103(4). If a defendant is an especially mitigated or standard offender convicted of a Class C, D, or E felony, he or she should be considered as a favorable candidate for alternative sentencing in the absence of evidence to the contrary. T.C.A. § 40-35-102(6).

As a Range III, persistent offender convicted of a Class C felony, the possible range of punishment for the Defendant was ten to fifteen years. See T.C.A. § 40-35-112(c)(3). In imposing the eleven-year sentence, the trial court based its decision upon the following enhancement factors: (1) the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (2) the offense involved more than one victim; (3) the Defendant has failed to comply with the conditions of a sentence involving release into the community; and (4) the Defendant was on probation when he committed the offense in the present case. See T.C.A. § 40-35-114(1), (3), (8), (13) (2006). The court found one mitigating factor, the Defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense. See id. § 40-35-113(8). The Defendant does not contest application of any of the enhancement factors, arguing only that the eleven-year sentence is excessive. Although we

do not believe that the multiple victim factor can apply with this aggravated assault conviction, we conclude that the eleven-year sentence remains fully justified.

Finding that the Defendant committed the present offense while on probation for a previous offense, the trial court ordered that he serve the eleven-year sentence consecutively to a prior sentence and denied alternative sentencing:

> I'm as sympathetic as anyone else to anyone who has serious mental conditions, but the nature of this offense is so violent and so uncalled for and because [the Defendant] has so many prior convictions which the law indicates that I have to set him as a persistent offender has sort of foreclosed any alternative sentences or allowing him to be out in the community. And that's just based on the nature of the offense as well as his prior record. So 11 years consecutive.

Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant (2) is an offender whose record of criminal activity is extensive, or (4) is a dangerous offender whose behavior indicates little or no regard for human life, or (6) is sentenced for an offense committed while on probation. and no hesitation about committing a crime in which the risk to human life is high. Here, the court found that consecutive sentencing was appropriate because of the violent and uncalled for nature of the crime and the defendant's very lengthy record of prior convictions.

Rule 32(c)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court "specifically recite the reasons" behind its imposition of a consecutive sentence. See, e.g., State v. Palmer, 10 S.W.3d 638, 647-48 (Tenn. Crim. App. 1999) (noting the requirements of Rule 32(c)(1) for purposes of consecutive sentencing).

According to the presentence report, the forty-one-year-old Defendant's criminal history includes convictions spanning a fifteen-year time period for unlawful drug paraphernalia, burglary of an automobile, resisting arrest, theft of property under $500, vandalism under $500, evading arrest, prostitution, criminal impersonation, criminal trespassing, first degree burglary, possession of drugs, and forgery. While the Defendant's criminal record is so extensive it is difficult to determine his exact number of convictions, he has in excess of thirty felony and misdemeanor convictions in Tennessee and at least two felony convictions in Mississippi. The Defendant's criminal record and being on probation, in addition to the brutal nature of his crime, easily support the imposition of consecutive sentencing.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.


_____
JOSEPH M. TIPTON,  PRESIDING JUDGE